UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JOHN ANDREWS,

                Plaintiff,

v.                                       Civil No. 2:16cv681

CITY OF NORFOLK, VIRGINIA,
MARCUS JONES, individually
and in his official capacity
as City Manager, and
DOUGLAS L. SMITH, in his
official capacity as
Interim City Manager,

                Defendants.

## OPINION AND ORDER

This matter is before the Court on a motion to dismiss filed by defendants City of Norfolk ("City"), Marcus Jones ("Jones"), and Douglas L. Smith ("Smith," and collectively "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 15. For the reasons set forth below, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

On April 2, 2012, after a twenty-nine year career as a naval officer, Plaintiff John Andrews ("Plaintiff") was hired by the City of Norfolk as the Special Assistant to the City Manager for Veterans and Military Affairs. Compl. ¶ 13, ECF No. 1. Plaintiff's "primary job was to develop a program that would assist veterans transitioning from active military service to the private sector." Id. ¶ 15. Under Plaintiff's leadership, the City's veterans program became "highly successful." Id. Due in part to this success, the City won the All-American City Award for 2013. Id. Together with a small group of others, Plaintiff was sent to Denver, Colorado to accept the award on behalf of the City. Id.

As part of his job, throughout the summer and fall of 2012, Plaintiff met repeatedly with Rosye Cloud, White House Director of Policy for Veterans, Wounded Warriors and Military Families, in an effort to develop ideas for improving veteran employment. Id. ¶ 14. In mid-2013, Rosye was transferred to the Department of Veterans Affairs ("VA") to assume the role of Senior Advisor for Veteran Employment, reporting to the Deputy Under Secretary

---

[1] The facts recited here are drawn from the complaint and are assumed true for the purpose of deciding the motion to dismiss currently before the Court. They are not considered factual findings for any purpose other than consideration of the pending motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

in the Office of Economic Opportunity.  Id. ¶ 16.  As part of this new role, Rosye led the VA in a significant overhaul of the internet-based Veterans Employment Assistance Program.  Id. After significant development, the revised program would ultimately launch as the Veterans Employment Center ("VEC"), with the "salient and aspirational elements" disclosed in mid-2014.  Id. ¶¶ 17, 19.

Rosye's husband, Chad Cloud, owned a company that "develop[ed] and [sold] software that help[ed] veterans transition to new careers."  Id. ¶ 18.  On May 27, 2014, prior to the details of the VEC being publicly disclosed, "Chad Cloud's company filed a patent application for software the purpose of which was to address and support the VA's online jobs initiative that his wife was leading."  Id. ¶ 19.

On August 14, 2014, Rosye visited Hampton Roads for a series of meetings to promote the VEC and related initiatives. Id. ¶ 20.  At one of these meetings, Plaintiff presented about his own efforts with the City's veterans programs.  Id.  The following day, Plaintiff chaired a meeting of the Tidewater Community College Center for Military and Veteran Education Advisory Committee ("CMVE Advisory Committee").  Id. ¶ 21.  At the event, Rosye was invited to present about her online jobs initiatives for veterans, and Chad participated as a vendor and was scheduled to provide a demonstration of his software.  Id.

3

¶ 23.   However, "[t]he Clouds did not realize that they were each presenting to the same organization that morning." Id. Nearly an hour into Rosye's presentation, the situation was discovered.   Id.   Plaintiff "realized that it presented a procurement integrity issue having them both making their presentations on the same issue." Id. ¶ 24.   After Plaintiff expressed his concerns, Rosye left the meeting with her team. Id.   Chad then gave his presentation, and while the software appeared to be "quite effective," it also appeared to "significantly overlap[] with elements of the program the Veterans Administration was seeking to implement." Id. ¶ 25. Plaintiff reported the incident to Deputy City Manager Sabrina Joy-Hogge.   Id.

In October 2014, Plaintiff visited Washington, D.C. for meetings regarding veterans' employment.   See id. ¶¶ 26-27. During this trip, "it became clear to [Plaintiff] that Chad Cloud, and Cloud's financial backer, . . . had been given the details of [Plaintiff's] trip to Washington, including his itinerary and the identity of the congressional staffers with whom [Plaintiff] was meeting." Id. ¶ 27.   The only possible source of that information was from City officials.   Id. Subsequently, Plaintiff learned that Chad was "bragging about his influence within the Veterans Administration," id. ¶ 29, and that Chad had explained to a colleague that "the VEC will be an

4

ally" because "[t]hey do about 20-30% of what we have right now and of course they can't violate our patent, so we are exploring how they work together so they don't have to re-invent the wheel," id. ¶ 28.

Increasingly concerned about possible impropriety between Chad's software and Rosye's online veterans initiative, on November 6, 2014, Plaintiff sent a detailed email to Deputy City Manager Wynter Benda expressing his concern.    Id.  ¶  27. Plaintiff wrote that the situation "gives me cause for concern and I would hate to see the City caught up in the mess that would result if there have been improprieties in this process." Id.  Finally, on Friday, November 21, 2014, frustrated by the City's "lack of interest or inability to fully consider his concerns," Plaintiff wrote an email directly to Rosye asking: "Is your husband, Chad Cloud, associated in any way with the operation of the Veterans Employment Center (VEC) that resides within the eBenefits portal?"  Id. ¶ 30

A few hours later, the administrative assistant to City Manager Marcus Jones called Plaintiff and stated that Jones wanted to meet with Plaintiff at 2:00 p.m.  Id. ¶ 31.  At 1:50 p.m., the administrative assistant notified Plaintiff that the meeting had been delayed.    Id.  Eventually, Plaintiff was informed that he could leave for the day, and that the meeting would be held on Monday, November 24, 2014.    Id.   On Monday

morning, Jones fired Plaintiff, stating that "[t]his is just not a good fit." Id. ¶ 32.

On November 23, 2016, Plaintiff filed a complaint in this Court, alleging that Defendants had wrongfully discharged him in violation of state and Federal law. Id. ¶ 1. According to Plaintiff, he was wrongfully discharged because "he raised concerns and questions about, and engaged in activity to prevent, potential waste, fraud and abuse associated with a federal, municipal and state program intended to assist Hampton Roads' veterans in their transition from military service to employment in the private sector." Id. ¶ 2. Plaintiff alleged four specific counts against Defendants: (1) wrongful dismissal and abridgment of free speech rights in violation of the First Amendment asserted pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; (2) retaliation in violation of the False Claims Act; (3) violation of the Virginia Fraud Against Taxpayers Act; and (4) termination in violation of the public policy of Virginia.

On March 17, 2017, Plaintiff filed an amended complaint, ECF No. 14, and on April 13, 2017, Defendants filed a motion to dismiss the amended complaint for failure to state a claim, ECF No. 15, together with a memorandum in support, ECF No. 16. Plaintiff filed his memorandum in opposition on May 4, 2017, noting that he had "no objection to dismissal, with prejudice,

of his claims for unlawful retaliation under the Virginia Fraud Against Taxpayers Act asserted in Count III and for termination in violation of Virginia public policy asserted in Count IV." ECF No. 19.  Plaintiff represents that he will not be prosecuting these two counts any further.  Id. at 1.  Defendants filed a reply brief on May 10, 2017, ECF No. 20, and requested a hearing on the motion to dismiss on May 16, 2017, ECF No. 21. The Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.  Having been fully briefed, this matter is ripe for review.

## II. STANDARD OF REVIEW

The well-established Rule 12(b)(6) standard of review permits dismissal when a complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint fails to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Though a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 555; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

7

A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)). Although the truth of the facts alleged is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

### III. DISCUSSION

Defendants argue that Plaintiff's complaint should be dismissed in its entirety for failure to state a claim on any of

his alleged claims. Plaintiff has stated that he will not prosecute Count Three (violation of the Virginia Fraud Against Taxpayers Act) and Count Four (termination against the public policy of Virginia) any further, and informed the Court that he does not object to the dismissal with prejudice of these claims. Pl.'s Resp. Br. 1, ECF No. 19. Accordingly, Count Three and Court Four are **DISMISSED WITH PREJUDICE**. The Court will address Defendants' arguments with regard to Plaintiff's First Amendment retaliation claim (Count One) and False Claims Act retaliation claim (Count Two) in turn.

### A. Count 1: First Amendment Retaliation Claim

#### 1. Defendant City and Defendants Smith and Jones in Their Official Capacities

In Count One, pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendant City, and Defendants Smith and Jones in their official capacities, violated his First Amendment right to free speech in "raising complaints, concerns and questions about the actions of Rosye Cloud and Chad Cloud." Am. Compl. ¶ 38. Defendants argue that Plaintiff has failed to sufficiently allege a claim against the City and Defendants Smith and Jones in their official capacities because Plaintiff has not alleged that "an official policy or custom" led to Plaintiff's termination, or that either Jones or Smith had "final authority

to establish municipal policy as to the termination of Plaintiff." Defs.' Opening Br. 14, ECF No. 16.

For purposes of liability under Section 1983, a suit against a municipal employee in his official capacity is treated as a suit against the municipality itself. Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)). Plaintiff concedes that suing city employees in their official capacity is "tantamount" to suing the City. Pl.'s Resp. Br. 23 n.8, ECF No. 19. Thus, Plaintiff's Section 1983 claims against Defendants Jones and Smith in their official capacities and Plaintiff's Section 1983 claim against the City are treated as a single claim of liability against the City.

To state a plausible claim against the City under Section 1983, Plaintiff "must show that the defendant acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused injury." Woodson v. City of Richmond, 2 F. Supp. 3d 804 (E.D. Va. 2014) (citing Brown v. Mitchell, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004)). Therefore, "[s]ection 1983 is a vehicle for the vindication of pre-existing federal rights rather than an independent source of substantive rights." Id. (citing Brown, 308 F. Supp. 2d at 692).

Municipalities are "persons" for the purposes of Section 1983 liability and, therefore, "[a] municipality or other local

10

government may be liable under [Section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citing Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 692 (1978)).  However, "under § 1983 local governments are responsible only for 'their own illegal acts.'"  Id. (emphasis in original) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)).  Municipalities are not vicariously liable under § 1983 for their employees' actions under a theory of respondeat superior.  See id. (citations omitted).

For Plaintiff to plausibly state a claim against the City, Plaintiff must show that the City deprived him of a constitutional right "'through an official policy or custom.'" Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

Id. (alteration in original) (quoting Carter, 164 F.3d at 217). A plaintiff may rely on any of those four possible theories of

11

liability to attribute a deprivation of constitutional rights to a municipality. However,

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).

Here, while Plaintiff spends considerable time in his complaint and in his response brief explaining how Defendants violated his constitutional rights, he does not allege any facts regarding how the City is liable for this alleged violation based upon any of the four grounds stated in Lytle. Plaintiff fails to allege that there was "an official policy or custom" that caused his termination, that either Defendant Jones or Smith had final decision-making authority, that there was a "failure to properly train" amounting to "deliberate indifference" to the rights of citizens, that there was a "pervasive" custom of violating rights, or that "the municipality was the 'moving force' behind the injury alleged." Id.; see Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 n.3 (4th Cir. 2017) ("Because [the plaintiffs] protest a single

employment decision involving no municipal policy, the town is not liable." (citing Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 966 (4th Cir. 1995))). Thus, because Plaintiff has not alleged any of the requisite grounds for holding the City liable on a Section 1983 claim, Defendants' motion to dismiss count one as alleged against the City, and Defendants Jones and Smith in their official capacities,[2] is **GRANTED**.

## 2. Defendant Jones in His Individual Capacity

In addition to the official capacity claims discussed above, Plaintiff advances a claim pursuant to 42 U.S.C. § 1983 against Defendant Jones in his individual capacity. Defendant Jones argues that this claim should be dismissed because he is entitled to qualified immunity on the basis (1) that Plaintiff's speech was not protected and therefore Defendant Jones did not violate Plaintiff's constitutional rights, or (2) alternatively, that even if Defendant Jones violated Plaintiff's constitutional rights, such rights were not "clearly established" at the time. Defs.' Opening Br. 5-13.

---

[2] Plaintiff argues in his memorandum in opposition to Defendants' motion to dismiss that qualified immunity does not shield Jones and Smith, in their official capacities, from the several forms of equitable relief that Plaintiff seeks. Id. at 2. The Court agrees that qualified immunity does not bar injunctive relief, but Plaintiff's claim fails because he has not adequately alleged grounds on which to hold the City of Norfolk liable under 42 U.S.C. § 1983.

13

Individual capacity claims are subject to scrutiny under the doctrine of qualified immunity, sometimes known as "good faith immunity," which has its origins in common law tort immunity.   See Filarsky v. Delia, 566 U.S. 377, 380 (2012).   As explained by the United States Court of Appeals for the Fourth Circuit:

> The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because qualified immunity is an immunity from suit rather than merely a defense to liability, such immunity effectively is lost if a court erroneously permits a case to proceed to trial. Pearson, 555 U.S. at 231, 129 S.Ct. 808 (citation omitted).

Meyers v. Baltimore County, Md., 713 F.3d 723, 730-31 (4th Cir. 2013).   The doctrine of "[q]ualified immunity protects public officials from [a civil money damages] suit when the state of the law is such that they would not have known that their conduct violates statutory or constitutional rights." Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 395 (4th Cir. 2014) (citations omitted).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). However, "[t]he burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014) (quoting Meyers v. Baltimore Cty., Md., 713 F.3d 723, 731 (4th Cir. 2013)); cf. Henry v. Purnell, 501 F.3d 374, 383 n.4 (4th Cir. 2007) (noting "conflict in our caselaw" regarding which party bears the burden of proof after the assertion of qualified immunity as an affirmative defense).

"To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that make out a violation of a constitutional right, or that (2) the right at issue was [not] 'clearly established' at the time of its alleged violation." Owens, 767 F.3d at 395-96 (alternation in original) (internal quotation marks and citation omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." al-Kidd, 563 U.S. at 735. If a court finds that the law was "not clearly established," the court is not required

to "reach the other step in the analysis—whether a constitutional violation actually occurred." Crouse, 848 F.3d at 584.

"In order to hold that a right is clearly established, a court does not need to find 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" Crouse, 848 F.3d at 583 (quoting al-Kidd, 563 U.S. at 741). Courts must not "define clearly established law at a high level of generality." al-Kidd, 563 U.S. at 742. "The dispositive question is whether the violative nature of particular conduct is clearly established . . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted) (emphasis in original).

Defendant Jones argues that he is entitled to qualified immunity on both grounds: (1) because Plaintiff has not alleged a violation of a constitutional right, and (2) alternatively, because the constitutional right was not clearly established. Defs.' Opening Br. 5-13. Because the Court finds below that the right was not clearly established, the Court does not reach the other step in the analysis regarding whether a constitutional violation actually occurred. See Crouse, 848 F.3d at 584.

To assert a First Amendment retaliation claim against a government employer, a plaintiff must satisfy the following three elements of such claim: (1) that the employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest"; (2) that the interest of the employee in speaking freely outweighs the interest of the government employer in providing efficient services; and (3) that the employee's speech caused the retaliatory action. Id. at 583 (internal citations and quotation marks omitted).

The first element of a First Amendment retaliation claim requires: (1) that "the speech was made as a citizen" and not "pursuant to the employee's duties," and (2) that "the content of the speech addressed a matter of interest to the community rather than complaints over internal office affairs." Id. (internal citations and quotation marks omitted). The determination of whether Plaintiff spoke as a private citizen is a "question of law for the court," and "should be made by examining the 'content, form and context of a given statement, as revealed by the record as a whole.'" Holland v. Rimmer, 25 F.3d 1251, 1255 (4th Cir. 1994) (quoting Connick, 461 U.S. at 147-48). The threshold question is whether Plaintiff's expression was "'done pursuant to [his] professional duties? If so, then the First Amendment has no application.'" Shenoy v.

Charlotte-Mecklenburg Hosp. Auth., 521 F. App'x 168, 172 (4th Cir. 2013) (quoting Davis v. Cook County, 534 F.3d 650, 653 (7th Cir. 2008)). The reason that the First Amendment does not apply in such circumstances is that it "does not protect speech made pursuant to a government employee's official duties, even when that speech is upon a matter of public concern." Crouse, 848 F.3d at 584 (emphasis added). When determining whether speech is made pursuant to a government employee's official duties, our court of appeals has observed that "[s]peech that is not explicitly required as part of [an employee's] day-to-day job may nevertheless fall within the scope of that employee's official duties." Shenoy, 521 F. App'x at 172 (internal citations and quotation marks omitted) (partial alternation in original).

The second element of a First Amendment retaliation claim "requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." Crouse, 848 F.3d at 583 (citing Pickering v. Bd. of Ed., 391 U.S. 563, 568 (1968)). This element, known as the Pickering balancing test, "demands a 'particularized' inquiry into the facts of a specific case." Id. (quoting Connick, 461 U.S. at 150). "In balancing the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient

government through its employees, [the court] must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency." McVey v. Stacy, 157 F.3d 271, 278 (4th Cir. 1998). Relevant factors include

> whether the employee's speech (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails."

Id. (quoting Rankin v. McPherson, 483 U.S. 378, 388-91 (1987)). "The Supreme Court has recognized that 'such particularized balancing is difficult.'" Crouse, 848 F.3d at 585 (quoting Connick, 461 U.S. at 150).

Defendant Jones argues that he is entitled to qualified immunity because Plaintiff's constitutional rights were not clearly established at the time. Defs.' Opening Br. 10. According to Defendant Jones, even if the Court were to conclude that Plaintiff was speaking as a private citizen on a matter of public concern, Defendant Jones is nevertheless entitled to qualified immunity because "it was not unreasonable that Jones believed Plaintiff was speaking as an employee and not as a

19

private citizen" given that Plaintiff's concern arose out of information he learned during his job, id. at 12 (emphasis added), and it is not "beyond debate" that application of the Pickering balancing test (employee's interest versus employer's interest) would weigh in Plaintiff's favor, id. at 11. In response, Plaintiff argues that the constitutional right of a government employee to raise concerns regarding public corruption has been clearly established by multiple cases. Pl.'s Resp. Br. 21.

Here, the "relevant question" is whether Defendant Jones could "reasonably have believed, at the time he fired [Plaintiff], that a government employer could fire an employee" after the employee raised concerns regarding a potential conflict of interest between a federal vendor and his federally-employed wife based upon information that Plaintiff learned while carrying out his official duties and that was related to the programs that Plaintiff was tasked with developing as part of his job. Lane, 134 S. Ct. at 2381.

In Plaintiff's complaint, he describes his job duties as "develop[ing] a program that would assist veterans transitioning from active military service to the private sector." Am. Compl. ¶ 15. As part of this effort, it appears that Plaintiff worked to develop programs to assist veterans with gaining education and employment. See id. ¶¶ 20-21. Plaintiff argues that

"making inquiries of a federal agency regarding the relationship between the head of a federal program and a vendor to that program was not in the ordinary scope of [Plaintiff's] duties," even if that federal program related to veterans—the same subject matter for which Plaintiff was responsible in his job. Pl.'s Resp. Br. 23. Additionally, according to Plaintiff, his email to Rosye on November 21, 2014 was outside of his official duties because "[i]t was not [Plaintiff's] duty to investigate fraud in the federal government." Id. at 24.

By contrast, Defendant Jones argues that Plaintiff learned of the possible conflict of interest as a direct result of his job, and, "from the perspective of someone in [Plaintiff's] position," was concerned that such conduct "could impair the public fisc." Defs.' Opening Br. 8; Am. Compl. ¶ 28. According to Defendant Jones, Plaintiff's initial concern regarding a potential conflict of interest arose at the CMVE Advisory Committee meeting related to the Federal veterans' jobs initiative, a "topic squarely within the scope of Plaintiff's job as Special Assistant to the City Manager for Veterans and Military Affairs." Defs.' Opening Br. 8. Further, Defendant Jones argues that Plaintiff's November 6, 2014, email to Deputy City Manager Wynter Benda was relaying information about a "perceived conflict as it related to collaborative documents between Rosye and the City" regarding veterans affairs. Id. at

21

9.    "In sum, as alleged, all of Plaintiff's dealings concerning Rosye Cloud pertained to veterans' jobs initiatives in some form or fashion, the same initiatives that were the primary focus of Plaintiff's job with the City of Norfolk."  Id.

Based on the unique facts in this specific situation, as alleged by Plaintiff, the Court concludes that the law was not clearly established that Plaintiff was speaking as a citizen when he notified City officials of concerns over Federal and third party collaboration related to projects that he was hired to develop.  In reaching this conclusion, the Court acknowledges the various arguments that weigh in favor of finding that Plaintiff's speech was that of a private citizen on a matter of public concern, including the following: (1) that concern over potential public corruption by either the City or the Federal Government is undoubtedly a matter of significant public interest; (2) that Plaintiff's concern was related in part to individuals outside of the City's employment; (3) that Plaintiff addressed his concerns not only to the City, but also to a federal employee (Rosye); and (4) that there was little reason to suspect that Plaintiff's concerns created a "threat" to Defendant Jones's "ability to manage" the office or was an "outgrowth of [Plaintiff's] private dissatisfaction[]."  See Crouse, 848 F.3d at 586.  However, whether Plaintiff's speech was protected or not, based upon the facts listed below, the

Court concludes that it was reasonable for Defendant Jones to believe that Plaintiff's speech was that of an employee speaking pursuant to his official job responsibilities: (1) Plaintiff learned of the relevant information through the course of his employment; (2) Plaintiff's concerns related to the specific subject matter of his employment—the development of veterans programs for the City and coordination of those City programs with the Federal program; (3) many of his concerns were expressed to individuals higher up in City management but were not made publicly; (4) Plaintiff voiced concerns about whether the City might be caught up in any scandal arising from any "impropriety" related to the City's collaboration with the Federal veterans programs; and (5) Plaintiff expressed his concern based principally upon the perspective of someone in his position. See Am. Compl. ¶ 28. While perhaps none of these facts individually would be sufficient to show that Plaintiff was speaking as an employee, taken collectively it was reasonable for Defendant Jones to believe that Plaintiff was speaking as an employee on matters related to his official responsibilities. Therefore, Plaintiff's First Amendment free speech right was not clearly established in this factual scenario, and Defendant Jones is accordingly entitled to qualified immunity.

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim alleged against Defendant Jones in his individual capacity is **GRANTED**.

### B. Count 2: Retaliatory Firing in Violation of the False Claims Act

In the second count of his complaint, Plaintiff alleges that he was impermissibly fired in retaliation for investigating a possible violation of the False Claims Act ("FCA"). Am. Compl. ¶¶ 42-49. Defendants argue that Plaintiff fails to state a claim because his speech was not protected activity under the FCA, and therefore his firing did not violate the FCA's anti-retaliation provision. Defs.' Opening Br. 14-21.

"The FCA is designed to discourage contractor fraud against the federal government." Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). The FCA imposes liability on "any person" who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. . . .

31 U.S.C. § 3729(a)(1). To allege an FCA claim, "a plaintiff must allege four elements: (1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the

Government."   United States v. Triple Canopy, Inc., 775 F.3d 628, 634 (4th Cir. 2015) (citation omitted).

"The phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly," Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999) ("Harrison I"), and "includes those instances 'when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct,'" such as by false certifications that certain conditions were met, U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (quoting Harrison I, 176 F.3d at 787).   A false certification may constitute a false or fraudulent claim "when a government contract or program require[s] compliance with certain conditions as a prerequisite to a government benefit, payment, or program; the defendant fail[s] to comply with those conditions; and the defendant falsely certifie[s] that it ha[s] complied with the conditions in order to induce the government benefit." Harrison I, 176 F.3d at 786.   The certification of compliance may be either explicit or implicit:   "When . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." Universal Health

Servs., Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 1999 (2016). "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Id. at 2002.

In addition to the requirement that a misrepresentation be materially false, a "statement is actionable under the [FCA] only if it constitutes a 'false or fraudulent claim.'" U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 454 (4th Cir. 2013) (quoting Harrison I, 176 F.3d at 785). As used within the FCA, a claim "means any request or demand, whether under a contract or otherwise, for money or property . . . ." 31 U.S.C. § 3729(b)(2). "'The statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" Harrison I, 176 F.3d at 785 (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995)). Therefore, "to trigger liability under the Act, a claim actually must have been submitted to the federal government for reimbursement, resulting in 'a call upon the government fisc.'" Nathan, 707 F.3d at 454 (quoting Harrison, 176 F.3d at 785).

Finally, the FCA explicitly protects whistleblowers from retaliation by their employers. Young v. CHS Middle E., LLC, 611 F. App'x 130, 132 (4th Cir. 2015). The whistleblower

provision "'protect[s] employees while they are collecting information about a <u>possible fraud</u>, before they have put all the pieces of the puzzle together.'" <u>Id.</u> at 132 (quoting <u>United States ex rel. Yesudian v. Howard Univ.</u>, 153 F.3d 731, 739 (D.C. Cir. 1998)) (emphasis added). In order to survive a motion to dismiss a retaliation claim pursuant to the FCA, a plaintiff "must plausibly allege that (1) he engaged in a protected activity; (2) the employer knew about the activity; and (3) the employer retaliated against him in response." <u>Carlson v. DynCorp Int'l LLC</u>, 657 F. App'x 168, 170 (4th Cir. 2016) (citing <u>Eberhardt v. Integrated Design & Const., Inc.</u>, 167 F.3d 861, 866 (4th Cir. 1999)).

Neither party contests the second and third elements of the retaliation claim, and so the Court will only address whether the first element is plausibly alleged. To establish the first element of "protected activity," a plaintiff must allege retaliation by his employer for either (1) the employee's "lawful acts done . . . in furtherance" of an FCA lawsuit or (2) the employee's "other efforts" to stop an FCA violation. 31 U.S.C. § 3730(h)(1).[3] Thus, an employee sufficiently alleges

---

[3] In an unpublished opinion considering the statutory interpretation of the FCA whistleblower provision, the Fourth Circuit explained its amendments:
> [Section] 3730(h) has been amended twice, once in 2009 and again in 2010. The 2009 amendment struck the reference to an FCA action altogether, describing protected activity as "lawful acts done ... in furtherance of other efforts to stop 1 or more violations"

that he engaged in protected conduct when he has alleged facts sufficient to show either (1) an FCA lawsuit is a "distinct possibility" or (2) that the employee had an "objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." Carlson, 657 F. App'x at 172 (assuming without deciding that the standard is whether the employee had an "objectively reasonable belief" that an FCA violation was occurring or was about to occur, and noting that various other circuits have adopted this same objective standard). To show an objectively reasonable belief regarding an FCA violation, a plaintiff must allege (1) facts sufficient to show that he believed that a person was violating or was about to violate the FCA, (2) that his belief was reasonable, (3) that he took action based on that belief, and (4) that the actions were designed to "stop 1 or more violations" of the FCA. Id. at 173.

Defendants argue that the Court should dismiss Plaintiff's FCA retaliation claim because Plaintiff fails to sufficiently

---

of the FCA. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, 1624-25 (2009) ("FERA"). The new provision was grammatically incorrect, however, as the word "other" was extraneous—the provision only covered "other efforts to stop [a] violation." Id. Congress amended § 3730(h) again in 2010, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1079A(c), 124 Stat. 1376, 2079 (2010), adding back some of the previously excised language. The provision now covers employee conduct "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).
Carlson v. DynCorp Int'l LLC, 657 F. App'x 168, 171 (4th Cir. 2016).

allege the first element of an FCA retaliation claim: that the employee engaged in a "protected activity." According to Defendants, Plaintiff's speech was not a protected activity because there was no "objectively reasonable possibility" of an FCA action for the following reasons: (1) there were no underlying actions by the Defendants in potential violation of the FCA, (2) there was no "claim" for, receipt, or use of Government money or property as required for an FCA claim, and (3) there was no "false or fraudulent conduct," only speculation that such could happen at some point in the future. See Defs.' Opening Br. 14-21.

Plaintiff argues first that § 3730(h) can reach Defendants' alleged retaliation because the statute plainly does not require that a retaliation claim be brought against the same party suspected of committing fraud. Pl.'s Resp. Br. 28., ECF No. 19. He next argues that it was "completely understandable and/or foreseeable" that Chad, or a representative of his software company, "would have been required to certify to the government that the provenance of their software was legitimate and free of unlawful taint, that provision of the software would not result in inappropriate financial benefit to a government employee or an employee's family member (e.g., Rosye Cloud), and that any services or products ultimately supplied to the government were not tainted by venal conduct." Am. Compl. ¶ 45. In light of

this belief, Plaintiff asserts that he "engaged in protected activity" under the FCA by "rais[ing] concerns, complaints and questions regarding the propriety of Chad Cloud's pursuit of a business relationship with Norfolk and other governmental agencies in Hampton Roads that was so closely tied to the activities of his wife, a senior governmental official." Id. ¶ 47.

The Court first assesses Defendants' argument that they cannot be liable under § 3730(h) because they are not alleged to have defrauded or to have been about to defraud the Government. The Court then turns to examine whether Plaintiff has alleged facts sufficient to show the following: (1) that he believed that a person was about to violate the FCA, (2) that his belief was reasonable, (3) that he took action based on that belief, and (4) that his actions were designed to stop a violation of the FCA. See Carlson, 657 F. App'x at 173.

### 1. Whether Defendants are Subject to 31 U.S.C. § 3730(h)

The Court first evaluates Defendants' argument that they are not subject to § 3730(h) because they did not make and were not about to make a false claim on the Government. "As with any question of statutory interpretation [o]ur first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the

30

particular dispute in the case." U.S. v. Goforth, 546 F.3d 712, 714 (4th Cir. 2008) (citations and internal quotation marks omitted). "If the statute is unambiguous, our inquiry into Congress' intent is at an end." Id. (citations and internal quotation marks omitted). Having examined the statute, the Court finds it plainly contains no language requiring that the retaliating employer be the same party alleged to have committed an FCA violation. This lack of statutory language weighs heavily against reading such a requirement into the statute. Moreover, the Court notes that several other courts interpreting the scope of § 3730(h) have similarly recognized that it permits retaliation claims in cases where an employer acts on behalf of a third party who is alleged to have violated the FCA. See Townsend v. Bayer Corp., 774 F.3d 446, 459-60 (8th Cir. 2014)(noting the absence of language in § 3730(h) requiring that a retaliation claim be brought against the same employer alleged to have violated the FCA, and finding that an employer could retaliate against an employee for reporting the fraud of important customers); United States ex. rel. Lang v. Nw. Univ., No. 04C3290, 2005 WL 670612, at *2 (N.D. Ill. Mar. 22, 2005) (allowing an FCA retaliation action against a university alleged to have retaliated on behalf of a related medical foundation); U.S. ex. rel. Satalich v. City of Los Angeles, 160 F. Supp. 2d 1092, 1107 (C.D. Cal. 2001) (allowing an FCA retaliation action

31

"where an employer without FCA liability could be in cahoots with other non-municipal entities who are potentially liable, and for that reason may be motivated to silence a whistleblower"); Nguyen v. City of Cleveland, 121 F. Supp. 2d 643, 649 (N.D. Ohio 2000) (permitting an FCA retaliation action against "an employer who discriminates against an employee, at the behest of or on behalf of another, when it is the other that seeks to retaliate against the employee for protected conduct"). This is true even where there is no allegation of coordination between the employer and the third party. See Townsend, 774 F.3d at 459-60 (noting that a retaliation claim need not require allegations that the employer "itself was acting in concert with [a third party] to defraud the government, or acting in concert with [a third party] to orchestrate the retaliation.")

The Court next assesses whether the Fourth Circuit's language in Carlson should be read as supporting the Defendants' position that Plaintiff did not engage in a protected activity since there were no underlying actions by the Defendants in potential violation of the FCA. In Carlson the Fourth Circuit stated that an employee bringing a retaliation claim must have a reasonable belief that "the employee's employer is violating, or soon will violate" the FCA. Id., 657 F. App'x at 172. (emphasis added). That case, however, is not on point to the issue at bar because it dealt with alleged retaliation involving an employee

32

who believed that his own employer was violating the FCA.  The Carlson court also cited three cases from sister circuits that included language indicating that a retaliation claim must include a reasonable belief that "the [employee's] employer is committing fraud against the government." See e.g. Fanslow v. Chi. Mfg. Ctr., Inc., 384 F.3d 469, 480 (7th Cir. 2004); Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 933 (8th Cir. 2002); Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002).  These cases also featured claims against retaliating employers who were alleged to have committed FCA violations, and they are therefore similarly not on point. See e.g. Fanslow, 384 F.3d at 472; Wilkins, 314 F.3d at 930; Moore, 275 F.3d at 840.

In light of the plain language in § 3730(h), which contains no language requiring that the retaliating employer be the same party alleged to have committed an FCA violation, and in light of the numerous well-reasoned cases reaching that conclusion when faced with such facts, the Court finds that the Fourth Circuit's language in Carlson was focused only on cases involving a retaliating employer that was allegedly violating the FCA and retaliating against its own employee.  The Carlson court did not have before it the more unusual retaliation scenarios like those featured in the instant case and does not speak to such scenarios.  Accordingly, this Court reads

33

§ 3730(h) as permitting actions against retaliating employers
even when they are not alleged to have themselves committed FCA
violations.

### 2. Plaintiff's Belief That a Person was About to Violate the FCA

Plaintiff alleges facts in his complaint sufficient to show
that he genuinely believed that a person was about to violate
the FCA.   As alleged by Plaintiff, Chad Cloud had patented
software that reasonably appeared to be created "through
inappropriate information or inappropriate advantages provided
by his wife." Am. Compl. ¶ 28. Plaintiff alleges that this
patent "overlapped significantly" with the online veterans
portal being promoted by Rosye, which was designed to "connect[]
transitioning service members, veterans and their families to
meaningful career opportunities," id. ¶ 26.   Plaintiff also
alleges that this patent was filed before the "salient and
aspirational elements of the VEC" were made public in mid-2014.
Id. ¶ 29.  According to an email from Chad to a colleague, later
forwarded to Plaintiff by a concerned third party, the Federal
program did "about 20-30%" of what Chad's program did, and
because the VA "can't violate our patent," Chad was "exploring"
how they would "work together."   Id. (emphasis added). Plaintiff
also learned that Chad was "bragging about his influence within
the Veterans Administration."   Id. ¶ 29. On the basis of these

34

alleged facts, Plaintiff could have formed a good faith belief that Chad and Rosye Cloud intended to perpetrate a fraud upon the United States Government.

At the motion to dismiss stage, the Court concludes that Plaintiff has sufficiently alleged that he subjectively believed that the Clouds were about to violate the FCA.  See United States ex rel. Cody v. Mantech Int'l Corp., 207 F. Supp. 3d 610, 621 (E.D. Va. 2016) (looking to an employee's good faith belief that an employer was engaging in unlawful conduct in light of whether "a reasonable employee in the same circumstances would believe, that the employer is committing fraud against the Government").

### 3. The Objective Reasonableness of Plaintiff's Belief

Next, Plaintiff must plausibly allege that his belief was objectively reasonable.  Carlson, 657 F. App'x at 173.  Despite the facts alleged showing Plaintiff's belief that an FCA violation was about to occur, Defendants argue that Plaintiff's belief was not reasonable because (1) there was no "claim" for, receipt, or use of Government money or property as required for an FCA claim, and (2) there was no "false or fraudulent conduct," only speculation that such could happen at some point in the future.  See Defs.' Opening Br. 14-21.  The Court considers Defendants' reasonableness arguments in turn.

### a. Objective Reasonableness of Plaintiff's Belief Regarding the Likelihood of a "Claim" Against the Government

The Court first evaluates Defendants' argument that it was not reasonable for Plaintiff to believe that a person was about to violate the FCA because there was no likelihood of a "claim" for Government money or property. In support of the reasonableness of his belief, Plaintiff alleges that "from the perspective of someone in [Plaintiff's] position," the Clouds' conduct had the reasonable appearance of impairing the public fisc. Am. Compl. ¶ 28. This impression arose as Plaintiff learned that Chad Cloud had patented relevant software, that such software would be necessary for the VEC, that Chad was planning to "explore" how to "work together" with the Government, and that Chad was "bragging about his influence within the Veterans Administration." Id. ¶ 29. The Court finds that, in light of Plaintiff's allegation that Chad's patented technology would be required in order for the Federal veterans program to operate as promoted, it would be reasonable for someone in Plaintiff's position to believe that Chad was about to make a financial claim on the Government for payment to either buy or license Chad's software.

### b. Objective Reasonableness of Plaintiff's Belief Regarding the Likelihood of a False or Fraudulent Claim

Having established that Plaintiff's belief regarding the likelihood of a claim occurring was objectively reasonable, the

Court next evaluates whether his belief that this claim would have been false or fraudulent was also objectively reasonable. Plaintiff's argument is that any claim by Chad would likely have entailed a legally false certification that his software was free from the taint of a conflict of interest. Am. Compl. ¶ 45. Defendants do not deny that a claim featuring a false certification of this kind would constitute a false claim under the FCA, but instead argue that the possibility of such false certification actually occurring is too speculative to be actionable. Defs.' Reply Br. at 14, ECF No. 20.

Plaintiff's false certification theory appears to concern the existence of an organizational conflict of interest ("OCI").[4] Federal Acquisition Regulation ("FAR") § 9.505(b) states that an OCI exists when a contractor competing for the award of any Federal contract possesses "an unfair competitive advantage."

---

[4] While the Court recognizes that Plaintiff does not specifically cite to the regulations listed below, Plaintiff does make repeated references throughout the complaint and the brief in opposition to the motion to dismiss to the requirement that prospective contractors certify that their products are free from the taint of a conflict of interest. The Court notes that the best pleading practice in Federal court would be to cite the specific regulation, but the Court will not dismiss Plaintiff's complaint for a mere "imperfect statement of the legal theory supporting the claim asserted." Johnson v. City of Shelby, 135 S. Ct. 346, 346 (2014) (reversing the dismissal of a claim in which plaintiffs failed to explicitly invoke a statutory provision that would support their claim, and stating that Twombly and Iqbal were not on point because those cases "concern the *factual* allegations *of* a complaint") (emphasis in original). Because Plaintiff has stated a legal theory with enough factual allegations to adequately give Defendants "notice as to the nature of the claim against [them] and the relief sought," Twombly, 550 U.S. at 574, the Court finds that the mere failure to specifically cite the regulation does not cause Plaintiff's complaint to fail to state a claim.

Id. An unfair competitive advantage may arise in a variety of circumstances, but the Fourth Circuit has explicitly recognized that one scenario where it exists is when one bidder has "access to procurement sensitive information while [] other bidders [have] none[.]"  Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 917 (4th Cir. 2003) ("Harrison II").  The Fourth Circuit has previously held that a failure to disclose the existence of an unfair competitive advantage can be actionable as a false statement when the certification of the absence of an OCI is an express condition of a contract. See Harrison II, 352 F.3d at 917.  In general, a contractor is ineligible for the award of a Federal contract when it has an OCI with respect to that contract.  FAR § 9.504(e).  Our court of appeals has also held that the existence of an OCI constitutes the kind of condition that would clearly be material to the Government's payment decision.  See id.

Applying the above standard to Plaintiff's alleged facts, the Court finds that Plaintiff has plausibly alleged that he had an objectively reasonable belief that Chad Cloud's claim would qualify as false or fraudulent under the FCA.  Plaintiff first claims that "all vendors seeking to provide software to the U.S. government must certify that the products/services offered are free from the taint of venal conduct and conflicts of interest."  Pl.'s Mem. Opp'n Defs.' Mot. Dismiss at 2, ECF No. 19.  While

Plaintiff does not cite the particular regulation that would be applicable to Chad Cloud's claim, the Court notes that FAR § 809.504(d) states that contracts with the VA require a prospective contractor to submit "a statement with its offer disclosing all facts relevant to an existing or potential organizational conflict of interest[.]" Id. Thus, any claim for payment that Chad Cloud would make to the VA would have been required to either certify the non-existence of an OCI or to have detailed all relevant facts related to the OCI.

Plaintiff next plausibly alleges that Chad Cloud's claim would be tainted by an OCI for two reasons. First, the allegation that Chad's patent was filed before salient features of the VEC were made publicly available raises an inference that he enjoyed access to procurement sensitive information that other potential bidders did not.[5]   Am. Compl. ¶ 28.   Plaintiff

---

[5] OCIs are usually divided into three groups: those involving "unequal access to information," "biased ground rules," and "impaired objectivity." See Daniel I. Gordon, Organizational Conflicts of Interest: A Growing Integrity Challenge, 35 Pub. Cont. L.J. 25, 30-32 (2005). An OCI for unequal access to information occurs "where a company has access to nonpublic information (typically through performance of a contract) that gives it an unfair advantage in the competition for a later contract." Id. Some courts have indicated that an OCI for unequal access to information may only occur where that information was learned from the performance of a prior government contract. See Turner Const. Co. v. United States, 94 Fed. Cl. 561, 569 (2010), aff'd, 645 F.3d 1377 (Fed. Cir. 2011) (stating that one element of an "unequal access to information" OCI was that "a firm must have access to 'nonpublic information' while performing a government contract."); GEO Grp., Inc. v. United States, 100 Fed. Cl. 223, 227-28 (2011) ("[FAR § 9.505-4] and other FAR provisions, however, make clear that a conflict based upon unequal access to information arises only where the information is obtained through performance of a government contract."). Several decisions from the Government Accounting Office ("GAO") and a decision from the Federal Circuit,

also alleges that Chad Cloud claimed that the VEC only did "20-30%" of what his own software could do, which also raises the question of how Chad could have known what the VEC's requirements were when that information was not yet publicly available. Id. Second, Chad's relationship with his wife, the federal official responsible for evaluating the need for Chad's software, along with the allegation that Chad was bragging about his influence within the VA, Id. ¶ 29, suggest that he would have enjoyed an unfair advantage in the process of evaluating potential bids for software contracts related to the VEC. Therefore, Plaintiff has alleged facts sufficient to show that Chad Cloud would have enjoyed an unfair competitive advantage over any other bidders for a future VA contract related to the VEC, and that Chad's claim would thus be tainted by an OCI.

---

however, clarify that, though a more unusual case, an OCI may also occur where a potential contractor hires a former government employee who has knowledge of pertinent non-public information. See e.g., NKF Eng'g, Inc. v. United States, 805 F.2d 372, 376 (Fed. Cir. 1986) (upholding the disqualification of a prospective contractor who hired a former government official who had participated in the relevant procurement process because, under FAR § 9.505, this gave the contractor "an unfair competitive advantage and therefore damages the integrity of the proposal system."); Matter of: Int'l Res. Grp., B-409346.2 (Dec. 11, 2014) (sustaining a protest on the basis of an OCI where the successful bidder hired a former government employee who may have "provided the firm with access to competitively useful, non-public information" that gave the firm "an unfair competitive advantage."); Holmes & Narver Servs., Inc./Morrison-Knudson Servs., Inc., A Joint Venture; Pan Am World Servs., Inc., B-235906 (Oct. 26, 1989) (finding that the involvement of former government officer who had access to "restricted information concerning the procurement" gave the awardee an "unfair competitive advantage" that warranted corrective action). Plaintiff's theory, that Rosye Cloud provided critical non-public procurement information to Chad Cloud, appears similar to those of the former government employees mentioned above. The Court therefore finds that Plaintiff has adequately alleged that Rosye Cloud conferred an unfair competitive advantage on Chad Cloud that would constitute an OCI under FAR § 9.505.

Finally, the Court finds it hard to believe Defendants' suggestion that Plaintiff's belief regarding the likelihood of a false or fraudulent claim was not objectively reasonable because it is highly uncertain whether Chad would actually make a false certification when submitting his claim. A contracting officer for a VA-related contract may disqualify a contractor from receiving the award of a contract if an OCI exists that cannot be mitigated or avoided. See FAR 809.504(b). In this case, the purported conflict of interest appears sufficient to have created an objectively reasonable belief in Plaintiff that Chad Cloud's product was tainted in such a way as to make it impossible to mitigate the apparent conflict. Thus, considering that all of Chad's purported efforts in this case would be for naught if he revealed the existence of the OCI, the Court finds that it would be objectively reasonable to believe that any claim that Chad Cloud submitted would also not disclose the existence of an OCI.

In view of the above considerations, Plaintiff has plausibly alleged that he had an objectively reasonable belief that Chad's claim would be false or fraudulent. As stated above, a failure to disclose an OCI when under an express requirement to do so is actionable as a false claim under the FCA. See Harrison II, 352 F.3d at 917. Because Plaintiff has alleged facts sufficient to show that he had an objectively

41

reasonable belief that Chad Cloud's claim would have been tainted by an OCI, that it would be reasonable to believe he would not disclose this fact, and that Chad would have been under an express requirement to make such a disclosure, the Court finds that it would be objectively reasonable to believe that Chad's claim would be false or fraudulent.

### 4. Plaintiff's Actions in Light of His Belief

The Defendants do not seriously dispute that Plaintiff took action in light of his belief that a person was about to violate the FCA. Carlson, 657 F. App'x at 173. According to the complaint, Plaintiff became concerned after Rosye spoke about the Federal veterans program at the same meeting where her husband Chad presented about his software, which "significantly overlapped with elements of the [Federal] program." Am. Compl. ¶ 24. Plaintiff addressed his concerns directly to Rosye at the time. Id. Plaintiff also reported the CMVE Advisory Committee meeting incident to Deputy City Manager Sabrina Joy-Hogge. Id. ¶ 25. On November 6, 2014, Plaintiff wrote an email to Deputy City Manager Wynter Benda explaining the relationship between Chad and Rosye and how the Federal program and Chad's software were very similar. Id. ¶ 27. Plaintiff had "additional discussions with both Wynter Benda and Marcus Jones in which he expressed concerns about the conflict of interest that existed between the Clouds." Id. ¶ 29. Finally, on November 21, 2014,

Plaintiff directly emailed Rosye to ask: "Is your husband, Chad Cloud, associated in any way with the operation of the Veterans Employment Center (VEC) that resides within the eBenefits portal?" Id. ¶ 30. In light of Plaintiff's allegation that he was fired because he "raised concerns and questions about, and engaged in activity to prevent potential waste, fraud and abuse associated with the VEC", Am. Compl. ¶ 2, ECF No. 1, his allegation that he did not know whether VEC would be implemented through a vendor (like Chad) or in-house at the VA, id. ¶¶ 25-26 and his allegation that Chad had bragged about his influence with the VA and the VA's apparent need for his software program, such communication was ostensibly aimed at determining whether Plaintiff needed to be concerned about a potential conflict of interest between Chad and Rosye as a result of any "procurement" of Chad's software program. Based upon the above, the Court finds that Plaintiff has plausibly alleged that he took actions regarding his belief that a person was about to violate the FCA.

### 5. Plaintiff's Actions Were Designed to Prevent an FCA Violation

Plaintiff must allege that his actions were designed to stop a violation of the FCA. Carlson, 657 F. App'x at 173. As explained above, Plaintiff repeatedly addressed his concerns to City management, such as communicating with deputy city managers Sabrina Joy-Hogge and Wynter Benda, in order to alert his

superiors to a scheme that appeared likely to perpetrate a fraud on the Federal government. The Fourth Circuit indicated in Carlson that internal reports of fraud to a Plaintiff's supervisors constitute "efforts to stop" a violation of the FCA. Id., 657 F. App'x at 172. While the reports in this case did not concern a violation within the Plaintiff's organization, Plaintiff's efforts appear to the Court to have been plausibly aimed at prompting his supervisors to take further actions to prevent, and in no way encourage, an FCA violation.

The Fourth Circuit also recognizes that investigatory efforts can constitute protected activity when there is a reasonable possibility of a viable FCA action. See Mann v. Heckler & Koch Defense, Inc., 630 F.3d 338, 347 (4th Cir. 2010). The Fourth Circuit has not specifically held that investigatory efforts are "efforts to stop" a violation of the FCA, but such efforts, when coupled with oppositional conduct such as confronting parties involved in a purported fraud, appear likely to qualify as "efforts to stop" an FCA violation. Plaintiff asserts that he gathered information on the Clouds throughout 2014, and that these efforts culminated in an email in which he confronted Rosye Cloud. The Court finds that the most plausible motivation for Plaintiff's email was a desire to prevent an FCA violation and therefore that these actions also constitute efforts to stop a violation of the FCA.

In summary, Defendants argue that Plaintiff has not sufficiently pled an FCA retaliation claim because Plaintiff did not engage in protected activity. The Court finds that, at this motion to dismiss stage, taking all facts alleged as true as it must when considering a motion to dismiss, Plaintiff has sufficiently pled facts to support a conclusion that his speech was a protected activity. Plaintiff has alleged facts that show that he subjectively held an objectively reasonable belief that a person was about to violate the FCA and that he took reasonable actions designed to prevent such violation. Thus, for the reasons set forth above, Defendants' motion to dismiss Plaintiff's FCA retaliation claim, on the ground that Plaintiff failed to allege that he engaged in protected activity, is **DENIED**.

## IV. CONCLUSION

Having fully considered the alleged facts and applicable law, for the reasons stated above, the Court **GRANTS IN PART and DENIES IN PART** Defendants' motion to dismiss Plaintiff's complaint. ECF No. 15. Because Plaintiff has not alleged any of the requisite grounds for holding the City liable on a Section 1983 claim, Defendants' motion to dismiss count one, as alleged against the City and Defendants Jones and Smith in their official capacities, is **GRANTED**, and such claim is **DISMISSED WITHOUT PREJUDICE**. Because it was reasonable for Defendant

Jones to believe that Plaintiff was speaking as an employee on matters related to Plaintiff's official responsibilities, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim alleged against Defendant Jones in his individual capacity is **GRANTED**, and such claim is **DISMISSED WITH PREJUDICE**.     Finally, because Plaintiff has pled facts that plausibly show that his speech was a protected activity under the False Claims Act, Defendants' motion to dismiss Plaintiff's False Claims Act retaliation claim is **DENIED**.     Finally, Defendants' request for a hearing on the motion to dismiss is **DENIED**.   ECF No. 21.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October 23 , 2017

46